UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

Case No. 9:12-cv-81120-HURLEY/HOPKINS

ADT LLC,

    Plaintiff,

        v.

SECURITY NETWORKS, LLC, and
VISION SECURITY, LLC,

    Defendants.
_____/

**DEFENDANT SECURITY NETWORKS, LLC'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

    Defendant, Security Networks, LLC ("SN"), through undersigned counsel, and pursuant to Federal Rule of Procedure 56, and S.D. Fla. LR 56(a), files the following Statement of Undisputed Material Facts in support of its Motion for Partial Summary Judgment:

    1.    According to the U.S. Census Bureau, over 80,000,000 1-unit detached housing structures existed in the United States in 2011. [U.S. Census Bureau, Selected Housing Characteristics, attached as **Ex. "1"**].

    2.    Virtually all owners of 1-unit detached housing structures, as well as small business and multi-unit structure owners, are potential security service customers. [Aff. of Joe Shields attached as **Ex. "2"** at p.3, ¶6].[1]

    3.    It is common knowledge that the United States residential and small business security market includes millions of customers. [Ex. 2 at p.3, ¶7].

---

[1] The Affidavit of Joseph Shields contains numbering errors on pages 2 and 3 in that more than one paragraph is numbered 6, 7, and 8. These numbering errors existed at the time the Affidavit was executed. For clarity, SN has cited to both the appropriate page and paragraph numbers.

1

4. It is common knowledge for those within the residential and small business security services industry that the penetrated portion of the residential and small business security market in the United States includes over ten million customers. [Ex. 2 at p.3, ¶8].

5. According to its Amended Complaint, Plaintiff, ADT LLC ("ADT"), is a Delaware limited liability company with its principal place of business in Boca Raton, Florida. [DE 59, ¶2].

6. According to its Amended Complaint, ADT is the "largest and best-known provider of electronic security services and equipment for homes and businesses in the United States." [DE 59, ¶8].

7. ADT has admitted that it is the largest provider of residential and small business security in North America. [ADT's Resp. to SN's Req. for Admis. No. 2, attached as **Ex. "3."**].

8. The ADT Corporation (NYSE: ADT) is a publicly traded company. [ADT 2012 Form 10-K, attached as **Ex. "4"** at PDF p.5**].**

9. The ADT Corporation conducts business through operating subsidiaries. [Ex. 4 at PDF p.5]

10. ADT is the United States operating subsidiary of The ADT Corporation. [Ex. 4 at PDF p.5; Ex. 2 at ¶10].

11. The ADT Corporation's 2012 Form 10-K represents a consolidated and combined statement of financials and operations of The ADT Corporation and its operating subsidiaries. [*E.g.*, Ex. 4 at PDF p.55]

12. The ADT Corporation's 2012 Form 10-K includes financial and operational information for its United States operating subsidiary, ADT. [*E.g.,* Ex. 4 at PDF pp. 5, 55].

13. Consistent with ADT's allegations [DE 59, ¶8] and ADT's admission that it is the "largest" provider of security services for homes and businesses [Ex. 3 at ¶2], The ADT Corporation reports that it serves more than six million residential and small-business customers, making it the largest company of our kind in both the United States and Canada. [Ex. 4 at PDF p.5; ADT's 2012 Annual Report at PDF p.6, attached as **Ex. "5."**].

14. On September 28, 2012, The ADT Corporation was spun off from Tyco International ("Tyco") (NYSE: TYC) and became an independent public company. [Ex. 4 at PDF p.5; Ex. 5 at PDF p.27].

15. Prior to The ADT Corporation's spin off from Tyco, ADT's financial and market positions were reported in Tyco's SEC Filings. [*E.g.*, Tyco 2011 Form 10-K at PDF p.6, attached as **Ex. "6"** (stating Tyco provided security services "around the world primarily operating under the ADT brand name" and "is one of the world's largest providers of electronic security systems and services"); Tyco Int'l 2010 Form 10-K at PDF p.7, attached as **Ex. "7"** ("We are one of the world's largest providers of electronic security systems and services."); Tyco Int'l 2009 Form 10-K at PDF p.6, attached as **Ex. "8"** (stating that Tyco provides security services through its "ADT Worldwide segment" and is "one of the world's largest providers of electronic security systems and services")].

16. The ADT Corporation has reported that the North American residential and small business security market was approximately $13,000,000,000.00 in 2012. [Ex. 4 at PDF p.12 ("We estimate that the market for residential and small business electronic security system sales, installation, monitoring and service in the United States and Canada is expected to be approximately $13 billion in 2012 and that it has grown at a compound annual growth rate of approximately 1% - 2% per year over the past five years."); Ex. 5, at PDF p.6].

17. The ADT Corporation has reported that it had more than six million residential and small business customers in 2012. [Ex. 4 at PDF p.5; Ex. 5, at PDF p.6].

18. The ADT Corporation has reported that its customer base represented 25% of the North American residential and small business security market in 2012. [Ex. 5, at PDF p.6].

19. Based upon The ADT Corporation's 2012 North American market share and customer reports, the total size of the penetrated portion of the North American residential and small business security market is approximately 25,600,000 customers (*i.e.*, four times The ADT Corporations' 25% share of that market). [Ex. 5 at PDF p.6 (indicating that The ADT Corporation claims 25% of the penetrated market); *see also* Ex. 4 at PDF p.6 (stating that the market is largely unpenetrated)].

20. SN is a Florida limited liability company with its principal place of business in West Palm Beach, Florida. [Ex. 2 at ¶14].

21. SN is a security monitoring company that competes with ADT in the United States residential and small business security market. [Ex. 2 at ¶15].

22. It is common in the industry for home security sales and installations to be handled by smaller "installer" companies, and for the subsequent electronic monitoring services to be handled by larger "monitoring" companies. [Ex. 2 at ¶16].

23. ADT and SN both operate in this manner. [Ex. 2 at ¶17].

24. ADT calls its "installers" ADT "dealers." [Ex. 2 at ¶18; Ex. 4 at PDF p.11 ("Our extensive dealer network, which consists of approximately 400 authorized dealers operating across the United States and Canada, extends our reach by aligning us with select independent security sales and installation companies. These authorized dealers agree to exclusivity with us for security related services.")].

25.     SN calls its "installers" SN "affiliates." [Ex. 2 at ¶19].

26.     Defendant Vision Security, LLC ("Vision"), is a home security installation company based in Utah that does business with SN. [Ex. 2 at ¶20].

27.     Vision is owned and operated independently of SN. [Ex. 2 at ¶21].

28.     Vision primarily provides security sales and installation services. [Ex. 2 at ¶22].

29.     SN provides security monitoring services for some, but not all, of Vision's customers. [Ex. 2 at ¶23].

30.     SN does not own or control any of the installers, such as Vision, with which SN does business. [Ex. 2 at ¶24].

31.     Vision and other installers that do business with SN not only attempt to sell security services to homeowners who already have home security systems, but also to homeowners who have not previously purchased security systems. [Ex. 2 at ¶25].

32.     SN's customer base consists of approximately 195,000 customers and represents less than 1% of the penetrated portion of the market. [Ex. 2 at ¶26].

33.     From October 1, 2010 to the present, SN has provided security monitoring service to at least 17,850 former ADT customers who received installation service by installers other than Vision (and certain other installers). [Ex. 2 at ¶27].

34.     ADT has alleged in its 5th Revised Initial Disclosures that, from May 2009 to July 2013 (a time period of more than 4 years), 143 current and former ADT customers were subjected to various deceptive sales practices by an employee of an installer company that did business with SN, such as Vision. [ADT's 5th Revised Initial Disclosures, attached as **Ex. "9"**].

35.     The 143 alleged witnesses from that 50-month period represent approximately four-fifths of one percent (.8%) of the total customers SN serviced who were formerly ADT

5

customers, exclusive of customers who received installation from Vision (and certain other installers). [Ex. 2 at ¶29].

36. The 143 alleged witnesses from that 50-month period represent approximately 0.073% (roughly one thirteenth of one percent) of SN's total approximate customer base. [Ex. 2 at ¶30]

37. The 143 alleged witnesses from that 50-month period represent approximately 0.0022% (roughly one five hundredth of one percent) of ADT's current total customers based upon The ADT Corporation's 2012 reporting. [Ex. 2 at ¶31].

38. The 143 alleged witnesses from that 50-month period represent approximately 0.00056% (around one two thousandth of one percent) of the current total North American penetrated market based upon The ADT Corporation's 2012 reporting. [Ex. 2 at ¶32].

39. Although ADT alleges to have identified 143 consumers from May 2009 to July 2013 (a time period of more than 4 years) who ADT contends witnessed deceptive sales practices by an employee of an installer that did business with SN, ADT has not taken any of those witnesses' depositions in this case. [Ex. 2 at ¶33].

40. ADT has only obtained Affidavits from 10 customers in this case, copies of which were attached to ADT's October 2012 Motion for Temporary Injunction. [DE 5].

41. Those 10 customers represent approximately 0.056% (roughly one eighteenth of one percent) of the total customers SN serviced who were formerly ADT customers, exclusive of customers who received installation from Vision (and certain other installers). [Ex. 2 at ¶35].

42. The 10 customers from that 50-month period represent approximately 0.0051% (one one-hundred ninety fifth of one percent) of SN's total approximate customer base. [Ex. 2 at ¶36].

6

43. Those 10 customers represent approximately 0.00016% (roughly one six thousand four hundredth of one percent) of ADT's current total customers based upon The ADT Corporation's 2012 reporting. [Ex. 2 at ¶37].

44. Those 10 customers only represent approximately 0.000039% (roughly one twenty-five thousandth of one percent) of the current total North American penetrated market based upon The ADT Corporation's 2012 reporting. [Ex. 2 at ¶38].

45. Each of those 10 customers state that a sales employee of an installer that does business with SN made various individualized types of deceptive oral statements during a door-to-door sales presentation that were misleading in some manner. [DE 5-1].

46. At least the following 3 customers who provided affidavits to ADT alleged various misrepresentations that did not involve a false affiliation with ADT:

   a. Mrs. Evelyn Magnetti's Affidavit alleges that the installer's employee told her "there had been home invasions in [her] neighborhood where phone lines had been cut and because ADT did not offer a cellular back up like Security Networks; [her] home could be 'broken into.'" [DE 5-1 at Ex. 5].

   b. Mr. Anthony Cagnolatti alleges that the installer's employee told him that "ADT moved to the San Diego area and was 'no longer servicing' the accounts in [his] neighborhood" and that "'GE' would be servicing the area'…." [DE 5-1 at Ex. 10].

   c. Ms. Helen Reynolds alleges that the installer's employee told her that "he was from Security Networks and ADT was not responding to alarms." [DE 5-1 at Ex. 12].

47. Those 3 customers only represent approximately 0.017% (roughly one fifty-eighth of one percent) of the total customers SN serviced who were formerly ADT customers, exclusive of customers who received installation from Vision (and certain other installers). [Ex. 2 at ¶41].

48. Those 3 customers from that 50-month period represent approximately 0.0015% (one six hundred fiftieth of one percent) of SN's total approximate customer base. [Ex. 2 at ¶42].

49. Those 3 customers only represent approximately 0.000047% (roughly one twenty-one thousandth of one percent) of ADT's current total customers based upon The ADT Corporation's 2012 reporting. [Ex. 2 at ¶43].

50. Those 3 customers only represent approximately 0.000012% (roughly one eighty-five thousandth of one percent) of the current total North American penetrated market based upon The ADT Corporation's 2012 reporting. [Ex. 2 at ¶44].

51. Neither the installers nor their employees were authorized by SN to engage in any of the misrepresentations ADT has alleged. [Ex. 2 at ¶45].

52. Each of the alleged actions by the installers' employees would be contrary to SN's written corporate policies, training, and agreements governing the conduct of installers. [Ex. 2 at ¶46].

53. The misrepresentations ADT alleged were not the result of an organized or coordinated campaign to harm ADT. [Ex. 2 at ¶47].

54. It is impossible, from a practical perspective, to completely prevent unauthorized actions of rouge sales personnel in the field while they conduct door-to-door sales presentations. [Ex. 2 at ¶48].

55. Not even ADT assures complete compliance by the third parties who are involved in sales for ADT. [Ex. 4 at PDF p.33 ("We [*i.e.*, The ADT Corporation] are diligent in our efforts to comply with all such applicable regulations, but cannot assure you that we or third parties that we rely on for telemarketing, email marketing and other lead generation activities will be in compliance with all applicable regulations at all times.")].

56. For these reasons, certain members of the security industry, including ADT, have adopted the Electronic Security Association Code of Conduct (the "ESA Code") which requires

its members to implement programs adopting and enforcing the ESA Code by, among other things, "[i] maintaining processes to effectively collect and investigate complaints alleging violations of this Code, [ii] responding promptly to all such complaints and undertaking corrective actions, and [iii] enforcing this Code through appropriate internal disciplinary procedures and actions." [DE 5-1, p.33; Ex. 2 at ¶49].

57. ADT was involved in establishing the ESA Code to promote a uniform method of reducing deceptive sales and responsibly responding to the complaints that all security companies inevitably receive. [Ex. 2 at ¶50].

58. SN has adopted policies similar to those embodied in the ESA code and has a compliance department which is involved in investigating and responding to customer complaints, and implementing disciplinary action when appropriate. [Ex. 2 at ¶51-52].

59. None of the alleged actions by the installers' employees were part of any policy, practice, or campaign that was adopted, implemented, authorized, conducted or otherwise condoned by SN. [Ex. 2 at ¶53].

60. Most customers pay approximately $30 to $40 per month for their security monitoring service. [Ex. 2 at ¶54].

61. Of the 143 customers ADT has alleged as its witnesses, approximately 42 were never an SN customer and the agreements for 42 others were cancelled. [Ex. 2 at ¶55].

62. Security companies like SN and ADT maintain contact information, such as addresses and/or phone numbers, for their current and former customers. [Ex. 2 at ¶56].

63. On August 1, 2013, ADT served a "Second Notice of Violation" purporting to contain a description of 9 new alleged customer witnesses who were not contained in ADT's Fifth Revised Initial Disclosures. [8/1/13 Second Notice of Violation, attached as **Ex. "10"**].

64. The Second Notice of Violation describes several asserted additional alleged misrepresentations which did not involve an alleged false affiliation with ADT, including the following:

   a. ADT alleges Ms. Nora Hurlong reported "[d]oorknocker (Jordan Showers) associated with Vision visited customer's home, knew details of the customer's alarm system, warned that telephone lines in the neighborhood were being cut, and offered to install a chip in customer's alarm keypad to enable it to communicate with monitors when telephone lines are cut." [Ex. 10 at ¶4].

   b. ADT alleges Mrs. Angela Williams reported "[d]oorknocker associated with Vision visited customer's home, stated that customer's wired system was being phased out in favor of wireless systems, offered to update alarm panel's SIM card to make the panel compatible with new requirements, but refused to provide business card when asked to identify himself." [Ex. 10 at ¶8].

Dated this 2nd day of August 2013.   Respectfully submitted,

**/s/ Scott W. Atherton**
Scott W. Atherton, Esq.
Florida Bar No. 749591
scott@athertonlg.com
**Atherton Law Group, P.A.**
224 Datura Street, Suite 815
West Palm Beach, FL 33401
Tel: (561) 293-2530
Fax: (561) 293-2593

*Attorneys for Security Networks, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 2, 2013, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system.  I also certify that the foregoing document is being served this day on counsel of record in the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

By: **/s/ Scott W. Atherton**
SCOTT W. ATHERTON
Fla. Bar No. 0749591

**SERVICE LIST**

*ADT LLC v. SECURITY NETWORKS, LLC et al.*

**Case No. 9:12-cv-81120-HURLEY/HOPKINS**

**Charles Sanders McNew**
McNEW P.A.
2385 NW Executive Center Drive
Suite 100
Boca Raton, FL 33431
561-299-0257
561-299-3705 (fax)
mcnew@mcnew.net

**Peter Martin Bernhardt**
McDonald Hopkins LLC
505 South Flagler Drive
Suite 300
West Palm Beach, FL 33401
561-472-2121
472-2975 (fax)
pbernhardt@mcdonaldhopkins.com

**Sonny J. Olsen**
Axiom Legal
730 S. Sleepy Ridge Drive
Suite 211
Orem, UT 84653
801-960-3695
sonny@axiom-legal.com

**John M. O'Bryan**
Freeborn & Peters, LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
312-360-6580
jobryan@freeborn.com

**Meghan E. Tepas**
Freeborn & Peters, LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
312-360-6454
mtepas@freeborn.com

**Terrance J. Sheahan**
Freeborn & Peters, LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
312-360-6580
Email: tsheahan@freeborn.com