UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-81120-Civ-Hurley/Hopkins

ADT LLC,

        Plaintiff,

v.

SECURITY NETWORKS, LLC and
VISION SECURITY, LLC,

        Defendants.
_____/

## REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MOTION TO ADJUDGE NON-PARTIES IN CONTEMPT OF THE PERMANENT INJUNCTION (DE 108)

**THIS CAUSE** has come before this Court upon an Order referring Plaintiff's contempt motion (DE 108) to the undersigned Magistrate Judge for a report and recommendation. (DE 109).

## PROCEDURAL HISTORY

On September 11, 2013, the parties to the underlying trademark infringement lawsuit agreed upon a final permanent injunction that would preclude Defendant Vision Security, LLC and its "owners, members, managers, agents, servants, employees, independent contractors, officers, directors, attorneys, partners, subsidiaries, successors and assigns, or any transferee of the businesses or assets of any Vision Entity (collectively, 'Vision'), and those acting in active concert with any of them" from engaging in deceptive sales practices likely to mislead Plaintiff ADT's customers and induce them to change their alarm monitoring service provider. (DE 105). Thereafter, on December 17, 2014, the District Court approved a revised version submitted by

1

the parties, which further prohibited Vision from training anyone to violate the terms of the injunction. (DE 107). The following month, January 2015, Vision entered into an Asset Purchase Agreement (APA) with non-party NorthStar Alarm Services, LLC (NorthStar). *See* Plaintiff's Exhibit 1.

On December 11, 2015, ADT filed the instant motion seeking to hold NorthStar and its president, non-party Robert Harris, in contempt of the permanent injunction, claiming that they are successors in interest to Vision and have been using the same misleading and deceptive sales practices to steal ADT's customers. (DE 108). NorthStar and Harris filed opposition papers denying that they are bound by the injunction because they are not "legally identified" with the enjoined party, Vision. (DE 122, 123).

On January 14, 2016, this Court held an evidentiary hearing on ADT's contempt motion. Two witnesses testified at the hearing: Robert Harris and Jason Christensen, who founded NorthStar in 2001 and serves as the company's CEO. At counsel's request, the Court agreed to bifurcate the hearing to first determine whether NorthStar and Harris are bound by the injunction and, if so, to then continue the evidentiary hearing to introduce evidence as to whether the injunction was in fact violated.[1]

## EVIDENCE PRESENTED

Under the terms of the APA dated January 16, 2015, NorthStar acquired approximately 8,000 customer accounts from Vision. (T. 63).[2] Before entering into the agreement with Vision, NorthStar had approximately 35,000 customer accounts. (T. 37, 40).[3]

---

[1] Following the hearing, counsel filed supplemental briefs on the preliminary issue of whether the non-parties are bound by the injunction. (DE 142, 143, 144).

[2] This is a reference to the transcript of the January 14, 2016 contempt hearing found at DE 141.

[3] According to NorthStar's CEO, Jason Christensen, the company also added 15,000 other new accounts in 2015, in addition to the 8,000 accounts acquired from Vision. (T. 89-90).

In addition to the customer accounts, the APA provided for the transfer of nearly $200,000.00 in cash (representing deferred revenues from Vision's customer accounts), Vision's "goodwill," and certain furniture, fixtures and equipment. *See* APA at p. 12. NorthStar also agreed to assume "only the liabilities of [Vision] relating solely to . . . the Customer Accounts and the Contracts . . . listed on Schedule 2.1," which included Vision's office leases and certain vendor agreements. *See* APA at p. 13; Schedule 2.1.

Beyond serving as NorthStar's president, Robert Harris is also the CEO and sole managing member of Vision. (T. 16, 40). In that capacity, he executed the underlying settlement agreement which resulted in the entry of the permanent injunction that enjoined Vision from engaging in deceptive sales practices that reportedly confused ADT's customers. (T. 16, 49; DE 104-2). Harris continues to serve as Vision's CEO, despite his role as NorthStar's president and the fact that after the asset transfer, he became a member of NorthStar's board of directors and received "roughly 14 percent" of NorthStar's stock.[4] (T. 16).

Under the terms of the APA, NorthStar also entered into employment contracts with three other senior members of Vision and was permitted to make job offers to Vision's employees and sales force. *See* APA at pages 1, 38. All four of the regional sales managers who worked for Harris at Vision went to work for NorthStar, where they again reported directly to Harris. (T. 22-24, 51). Harris testified that after the asset transfer, approximately 30-35 of Vision's 250 sales agents went to work for NorthStar (T. 52-53), and "just a few" employees remained at Vision. (T. 17, 20-21).

---

[4] Harris testified that the stock was transferred to a trust of which he is a partial beneficiary. (T. 16). Prior to the APA, 95% of NorthStar was owned by Christensen, Goldman Sachs, and the Beekman Group. Following the transfer of stock to Harris under the APA, Christensen, Goldman Sachs, and the Beekman Group owned 78% of NorthStar. (T. 90).

3

In fact, of the 70 employees that worked for Vision in 2014, the APA states that following the closing, Danielle Paletz would be the "sole remaining employee" of Vision. *See* APA at p. 13; (T. 20-21). She remained employed because Vision retained approximately 1,500 customer accounts that it would continue to service, although the actual alarm monitoring was provided by another company, Monitronics. (T. 31, 63). In addition to the 8,000 accounts transferred to NorthStar in 2015 as part of the APA, Harris testified that between September 2014 and February 2015, Vision also sold over 12,000 accounts to Monitronics in several "bulk sales" pursuant to Vision's "ongoing business practice." (T. 60-63).

According to Harris, after the closing on the APA, Vision discontinued its sales force and no longer sought to acquire new security accounts. (T. 24). Harris testified that "[t]here was no need to continue selling through Vision Security, since I was going to work for NorthStar." (T. 25). This was consistent with a clause in the APA that Vision would not compete with NorthStar's solicitation of new customer accounts. *See* APA at p. 37.

In his testimony, Harris acknowledged that his "main responsibility" at NorthStar is to "oversee sales operations and sales," but he denied managing or training the company's sales force. (T. 50, 64-65). According to Harris, he spends "the vast majority of [his] time recruiting and trying to . . . bring[] new individuals to work for NorthStar." (T. 64).

## DISCUSSION

Pursuant to Rule 65, court injunctions are only binding on the parties to a lawsuit and their officers, agents, servants, employees and attorneys who receive actual notice of the injunctive order. Fed. R. Civ. P. 65(d)(2).

Although judgments and injunctions ordinarily may be enforced only against the named parties, "under certain circumstances," Rule 71 permits enforcement of a court order against non-

4

parties. *Stotler & Co. v. Able*, 870 F.2d 1158, 1164 (7th Cir. 1989); 12 Charles Alan Wright, et al., *Federal Practice and Procedure* § 3033 (2d ed. 1987). *See also Lasky v. Quinlan*, 558 F.2d 1133, 1137 (2d Cir. 1977)("Rule 71 was intended to assure that [a] process be made available to enforce court orders in favor of and against persons who are properly affected by them, even if they are not parties to the action.").

Specifically, a court "may find a nonparty in contempt if that person has actual knowledge of the court order and . . . is legally identified" with the party named in the court order. *Stotler*, 870 F.2d at 1164. *See, e.g., Quinter v. Volkswagen of Am.*, 676 F.2d 969, 972 (3d Cir. 1982)(court found that an expert witness was "legally identified" with both the plaintiff and the plaintiff's attorney, thus justifying holding him in contempt)). Additionally, the complaining party must establish by clear and convincing evidence that the objectionable conduct violated an "unequivocal command" contained in the order. *Stotler*, 870 F.2d at 1163 (citations omitted).

The threshold issue presently before this Court is whether the injunction issued by the District Court in the underlying trademark infringement lawsuit binds NorthStar and/or Harris, even though neither was named as a defendant in the underlying action. NorthStar and Harris argue that they are not bound by the injunction, and cannot be held in contempt for violating its terms, because they were not parties to the underlying action, were not named in the injunction order, and are neither in privity with, nor a successor in interest to, Vision. ADT counters that NorthStar and Harris are properly subject to the injunction because there is sufficient privity between them and Vision. In the alternative, ADT claims that Vision effectively merged with NorthStar, thus rendering NorthStar a successor in interest to Vision's obligations under the injunction.

Based on the record evidence, this Court finds that ADT has shown by clear and convincing evidence that the APA resulted in a de facto merger between Vision and NorthStar such that liability under the injunction should attach to NorthStar as a successor in interest. Moreover, the Court finds that Robert Harris is also bound by the injunction and thus, if he engaged in conduct violative of the injunction, he would be liable under it.

### 1. Privity between Vision and NorthStar

At the outset, the Court rejects ADT's argument that there is sufficient privity between Vision and Northstar to justify extending the injunction's prohibitions to NorthStar. "Privity exists when a third party's interests are so intertwined with a named party's interests that it is fair to hold the third party bound by the judgment against the named party." *Am. Semiconductor, Inc. v. California Assignments LLC*, 2013 WL 5937968, at *4 (N.D. Cal. Oct. 30, 2013). Merely finding that a "key employee" was affiliated with both the enjoined defendant and the allegedly contemptuous non-party is "insufficient" to bind the non-party to the injunction. *G. & C. Merrimam Co. v. Webster Dictionary Company, Inc.*, 639 F.2d 29, 37 (1st Cir. 1980). Rather, the plaintiff must also establish that the non-party effectively "had his day in court with respect to the validity of the injunction." *Id. See also Lundy v. Haymond,* 2002 WL 1964336, *8 (E.D. Pa. Aug. 23, 2002)("The requirement of privity effectuates due process: an entity cannot be bound by a judgment unless it can be fairly said to have had its day in court.").

Here, there is insufficient evidence to conclude that NorthStar's interests are so intertwined with Vision's that NorthStar should be bound by the injunction. NorthStar existed for fourteen years before acquiring some of Vision's assets and was a much larger alarm company than Vision. There is no evidence that NorthStar's stockholders or board of directors had any relationship with Vision prior to the APA, nor is there any evidence that either NorthStar

or Vision had (or have) any control the other. Most importantly, NorthStar did not have any involvement in the underlying litigation, and its interests were not represented when the injunction was negotiated. *See Am. Semiconductor, Inc.*, 2013 WL 5937968 at *4 (plaintiff failed to show that either the non-party or the enjoined defendant had control over or represented the other; that the non-party purchased "substantially all" of the enjoined defendant's assets was insufficient to establish privity).

As the Supreme Court has held, courts may not extend the reach of an injunction "so broad as to make punishable the conduct of persons who acted independently and whose rights have not been adjudged according to law." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945). *See also* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2956, at 340–41 (2d ed. 1995)(when privity is the basis for binding a non-party it must be "restricted to persons so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated").[5]

## 2. Successor in Interest Liability

However, in the alternative, ADT seeks to impose liability upon NorthStar as a successor in interest. The general rule is that a corporation which purchases the assets of another corporation does not also assume the debts and liabilities of that corporation unless: (1) the buyer expressly or impliedly assumes the obligations of such debts, (2) the transaction is a de facto merger, (3) the buying corporation is a mere continuation of the selling corporation, or (4) the transaction is a fraudulent effort to avoid liabilities of the seller. *See Bud Antle, Inc. v. Eastern*

---

[5] Here, ADT claims that NorthStar was using similar deceptive sales practices to steal ADT's customers *before* entering into the APA with Vision. (DE 108 at p. 5). Thus, NorthStar's sales tactics were clearly established prior to, and independent of, NorthStar's relationship with Vision.

7

*Foods, Inc.,* 758 F.2d 1451, 1456 (11th Cir. 1985); *Coral Windows Bahamas, LTD v. Pande Pane, LLC,* 2013 WL 321584, at *3 (S.D. Fla. Jan. 28, 2013).

In its motion papers, ADT contends that the "asset transfer" was actually a merger of Vision into NorthStar.

> A de facto merger occurs where one corporation is absorbed by another, but without compliance with the statutory requirements for a merger. To find a de facto merger there must be continuity of the selling corporation evidenced by the same management, personnel, assets, and physical location; a continuity of the stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation; and assumption of the liabilities. All of the events, such as dissolution, need not occur at the same time. The bottom-line question is whether each entity has run its own race, or whether, there has been a relay-style passing of the baton from one to the other.

*Coral Windows Bahamas, LTD,* 2013 WL 321584, at *4 (citing *Amjad Munim, M.D., P.A. v. Azar,* 648 So. 2d 145, 153–54 (Fla. Dist. Ct. App. 1994)).[6]

Here, the record is replete with evidence that a de facto merger occurred. First, NorthStar hired a significant number of Vision's management, employees, and sales force, and after the asset transfer, only two people remained working at Vision: CEO Robert Harris and Danielle Paletz. Second, although Vision argues that NorthStar only acquired some of its assets, it appears that under the APA, NorthStar acquired the vast majority of the assets remaining after Vision's bulk sale of customer accounts to Monitronics. Indeed, all of Vision's furniture, fixtures and equipment were transferred to NorthStar, with the exception of those used by the sole remaining employee, Danielle Paletz. Third, the evidence shows that NorthStar assumed Vision's liability under its leases for office space in Utah and Arizona (*see* APA at Schedule 2.1), thus suggesting that NorthStar would continue operations at those physical locations.

---

[6] Even in federal question cases, courts typically use the "general doctrine of successor liability" applicable in most states. "The displacement of state law is particularly disfavored in the area of corporate law, because business decisions typically proceed in reliance on the applicable state standards." *United States v. Gen. Battery Corp.,* 423 F.3d 294, 304 (3d Cir. 2005)(in CERCLA case, the appellate court applied "the general doctrine of successor liability in operation in most states")(citing *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 105 (1991)).

Fourth, Harris continued as a stockholder in both entities, accepting a 14% stake in NorthStar in exchange for Vision's assets. *See Murphy v. Blackjet, Inc.*, 2016 WL 3017224, at *5 (S.D. Fla. May 26, 2016)(finding de facto merger even though "there was not complete continuity of shareholders . . . there was some continuation of the stockholders' ownership interests, which is sufficient to satisfy this element"). *See also United States v. General Battery Corp., Inc.*, 423 F.3d 294, 306-307 (3rd Cir. 2005)(successor liability does not necessarily turn on the seller's percentage interest in the buyer; rather, the critical inquiry is whether the owners retained some ongoing interest in their assets "after cleansing those assets of liability").

Finally, NorthStar relies heavily on the fact that Vision's business was not dissolved in the wake of the APA; rather, it continues to exist and service customer accounts, with Harris as its CEO. As the Eleventh Circuit has held, the dissolution element is satisfied if "[t]he seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible." *Bud Antle, Inc.*, 758 F.2d at 1458. Here, this Court finds that Vision's "ordinary business" was to solicit new customer accounts that it could then sell to other alarm monitoring providers. Indeed, Harris' testimony makes clear that Vision's "ongoing business practice" was to sell the customer accounts it acquired to Monitronics, who would then service and monitor them.[7] Thus, for all intents and purposes, Vision's primary business ceased when it entered into the APA, because it was no longer permitted to solicit new customers. Vision's primary business was never the servicing/monitoring of customer alarms, so to adopt NorthStar's argument that a de facto merger did not occur because Vision is still in operation "ignores the reality" of Vision's primary business purpose. *See Amjad Munim, M.D.*, 648 So. 2d at 155 (court found that sole shareholder's new medical practice was liable for debts of prior medical practice

---

[7] Even the 1,500 customer accounts that remain with Vision are monitored by Monitronics.

9

due to a de facto merger; shareholder's argument that prior medical practice was "still viable because it continues its collections on its past accounts receivable is to ignore the reality of this professional service corporation . . . whose primary purpose is to render medical services").[8]

Based on the foregoing, ADT has satisfied its burden of establishing by clear and convincing evidence that NorthStar is a successor in interest to Vision and, thus, it is bound by the provisions of the injunction in the underlying matter.

### 3. Does the Injunction Apply to Robert Harris?

Robert Harris, is also bound by the injunction entered against Vision because in his capacity as CEO and sole managing member of Vision, his liability is the same as if he had been a named party in the underlying lawsuit. *See Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of U.S., Inc.*, 628 F.3d 837, 848 (7th Cir. 2010)("an order issued to a corporation is identical to an order issued to its officers, for incorporeal abstractions act through agents")(citation omitted). *See also Additive Controls,* 154 F.3d at 1353 (where an individual is "legally identified" with the enjoined corporation, the individual is "bound by the injunction . . . just as if it had been directed to him personally;" court deemed the enjoined company's president and majority stockholder bound by the injunction under Rule 65(d)).

> The relevant question is whether the individual sought to be held liable is acting independently or remains legally identifiable with the corporation bound by the injunction. This is a case-specific inquiry that turns upon whether or not the individual is so identified in interest with those named in the decree that it would be reasonable to conclude that [his] rights and interests have been represented and adjudicated in the original proceeding. Factors to be considered include the non-party's position and responsibilities with the enjoined corporation, his

---

[8] As the case law indicates, the dissolution of the predecessor entity need not be simultaneous with the transfer of assets and work force for a de facto merger to occur. Rather, the dissolution must occur "as soon as is legally and practically possible." Given that Vision is contractually required to service the 1,500 accounts it has retained, it is not in a position to completely dissolve at this stage. Presumably, these 1,500 accounts were "disqualified" from transfer under the APA because they did not meet NorthStar's criteria. *See* APA at §2.6.

10

participation in the original litigation and the similarity between the activities of the corporation and those of the non-party.

*Matrix Essentials*, 346 F. Supp. 2d at 391-92 (citations and quotations omitted). *See also Nat'l Spiritual Assembly of Baha'is*, 628 F.3d at 854 ("It bears emphasizing that due process requires an extremely close identification and will be satisfied only when the nonparty 'key employee' against whom contempt sanctions are sought had substantial discretion, control, and influence over the enjoined organization -- both in general and with respect to its participation in the underlying litigation -- *and* there is a high degree of similarity between the activities of the old organization and the new.")(emphasis in original).

Here, the evidence is conclusive that Harris has the highest position and greatest responsibilities at Vision and that he was a major participant in the underlying litigation. Moreover, the record amply reflects the similarity between the business activities of Vision and NorthStar. These factors weigh heavily in favor of finding Harris personally bound by the injunction. *See Additive Controls*, 154 F.3d at 1353 (sole shareholder of enjoined corporation, who represented the corporations' interests in the injunction litigation, was deemed to be "legally identified" with that corporation, even after he resigned from his position as president; court found that the owner's "legal identification" with the enjoined company "precluded him from acting independently in the field of . . . the type subject to the injunction").

## RECOMMENDATION

Based on the reasoning set forth above, it is **HEREBY RECOMMENDED THAT** the District Court: (1) **GRANT** Plaintiff's motion to hold Non-parties NorthStar and Robert Harris bound by the permanent injunction and (2) permit this Court to continue the evidentiary hearing

to determine whether the injunction was violated and the non-parties should be held in contempt. (DE 110).

**NOTICE OF RIGHT TO OBJECT**

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Daniel T. K. Hurley, United States Senior District Court Judge for the Southern District of Florida, within fourteen (14) days of being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1) (2010) (providing that "within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court."). *See also* Fed. R. Civ. P. 72(b) (2011) ("Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy"). Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. *See LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE and SUBMITTED** this 9th day of June, 2016, at West Palm Beach in the Southern District of Florida.

_____
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE